# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

ANDREW WARD, Derivatively on Behalf of Nominal Defendant COGENT COMMUNICATIONS HOLDINGS, INC.,

36 Shinners Close
Bunyip VIC 3815
Australia

Plaintiff,

v.

DAVID SCHAEFFER
c/o Cogent Communications Holdings, Inc.
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

THADDEUS G. WEED
c/o Cogent Communications Holdings, Inc.
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

PAUL DE SA
c/o Cogent Communications Holdings, Inc.
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

STEVEN D. BROOKS
c/o Cogent Communications Holdings, Inc.
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

SHERYL KENNEDY
c/o Cogent Communications Holdings, Inc.
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

MARC MONTAGNER
c/o Cogent Communications Holdings, Inc.
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

**Case No. ______________**

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

LEWIS H. FERGUSON III
c/o Cogent Communications Holdings, Inc.
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

DENEEN HOWELL
c/o Cogent Communications Holdings, Inc.
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

EVE HOWARD
c/o Cogent Communications Holdings, Inc.
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

and

DAVID BLAKE BATH
c/o Cogent Communications Holdings, Inc.
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

Defendants,

and

COGENT COMMUNICATIONS HOLDINGS, INC.,
Reg. Agent: Corporation Service Company
2450 N Street, NW
Washington, D.C. 20037

Nominal Defendant.

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Andrew Ward ("Plaintiff"), by and through his undersigned attorneys, brings this Verified Shareholder Derivative Complaint for the benefit of Nominal Defendant Cogent Communications Holdings, Inc. ("Cogent" or the "Company"), against current and former members of the Company's Board of Directors and certain of its executive officers, for, among

other things, their breaches of fiduciary duties and violations of the federal securities laws, as set forth below.

Plaintiff's allegations are based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief, including a review of publicly available information, including filings by Cogent with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, filings in the securities class action captioned *City of Southfield Fire and Police Retirement System v. Cogent Communications Holdings, Inc., et al.*, Case No. 1:26-cv-02609 (D.D.C.) (the "Securities Class Action"), and matters of public record. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought against certain current and former officers and members of the Company's Board of Directors (the "Board") that seeks to remedy wrongdoing committed by the Individual Defendants (defined below) between February 29, 2024 and May 1, 2026, inclusive (the "Relevant Period").[1]

2. Cogent is a facilities-based provider of low-cost, high-speed internet access, private network services, optical wavelength and optical transport services, and data center colocation space and power. The Company delivers its services to businesses, communications service providers, and other bandwidth-intensive organizations in 57 countries across North America, Europe, South America, Asia, Oceania, and Africa.

---

[1]The Individual Defendants are David Schaeffer ("Schaeffer"), Thaddeus G. Weed ("Weed"), Paul de Sa ("de Sa"), Steven D. Brooks ("Brooks"), Sheryl Kennedy ("Kennedy"), Marc Montagner ("Montagner"), Lewis H. Ferguson III ("Ferguson"), Deneen Howell ("Howell"), Eve Howard ("Howard"), and David Blake Bath ("Bath"). The Individual Defendants, together with Cogent, are referred to herein as "Defendants."

3. On September 7, 2022, the Company announced an agreement to acquire T-Mobile's "Wireline" business (the "Acquisition"). At the time, the Wireline business was operating at a negative 80% margin and had experienced revenue declines of over 10% in each of the prior three years. T-Mobile therefore sold the business to Cogent for $1, subject to adjustments, and agreed to pay Cogent $700 million for "IP transit services" over fifty-four months, with $350 million to be paid in the first year (the "IP Transit Services Agreement").

4. The Individual Defendants touted the Acquisition and assured investors that the Company would repurpose the acquired network to meet demand for high-margin optical wavelength and transport services, including from artificial intelligence ("AI") companies and data center businesses. Defendant Schaeffer, Cogent's founder, Chief Executive Officer ("CEO"), and Chairman, promised that "the real meteoric growth in the combined business will come from our ability to sell the optical transport products or wavelengths," and by November 2023 had set a target of a $500 million annual run rate in wavelength sales by May 2028.

5. Throughout the Relevant Period, the Individual Defendants repeatedly assured investors that: (1) demand for Cogent's optical wavelengths was exceptionally strong; (2) the Company had a large and growing "backlog" and "funnel" of wavelength orders; (3) Cogent remained on track to hit its $500 million target; and (4) the Company had the financial strength to continue its long-standing dividend policy, which had produced fifty-two consecutive quarterly dividend increases.

6. In truth, the purported backlog was, by and large, illusory. A substantial portion of the reported orders was never going to become paying customer revenue, customers were unable or unwilling to accept delivery even after Cogent provisioned their wavelengths, the wavelength business was not performing at the levels needed to support the Company's financial targets, and the Company could not sustain its dividend. Indeed, on May 8, 2025,

Defendant Schaeffer admitted that "nearly 90%" of the funnel that existed at the end of the third quarter of 2024 "fell out," and characterized that outcome as "as expected."

7. At the same time, Defendant Schaeffer had pledged a large portion of his Cogent shares as collateral for margin loans that supported his Washington, D.C.-area commercial real estate portfolio, leaving him personally dependent on maintaining Cogent's stock price. While the Board's Audit Committee purportedly monitored those pledges, it permitted Defendant Schaeffer to exceed the numerical limits in the Company's own pledging policy and told investors that "there was not a material risk that he could be forced to sell Cogent shares involuntarily."

8. The truth began to emerge on February 27, 2025, when the Company disclosed that its wavelength backlog had declined from 3,400 to 2,700 orders, that it had added only 77 net wavelength connections in the fourth quarter of 2024, and that wavelength revenue was running at only approximately $28 million annually. The truth continued to emerge through a series of partial disclosures, including on May 8, 2025, August 7, 2025, November 6, 2025, and February 20, 2026, as the Company missed expectations, its credit rating was downgraded, lenders seized and sold $82.5 million of Defendant Schaeffer's pledged stock, and the Company slashed its quarterly dividend by 98%.

9. The truth was fully revealed on May 4, 2026, when Defendant Schaeffer admitted that "we have seen a variety of customers pushing out their acceptance of wavelengths. We actually provisioned more wavelengths in the quarter than we did in the previous quarter, but the customers did not accept them." On this news, the price of Cogent stock declined $6.79 per share, or approximately 29%, to close at $16.37 per share on May 4, 2026, a decline of more than 80% from the intraday Relevant Period high of $86.76 per share that it reached on November 7, 2024.

10. Throughout the Relevant Period, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct materially false and/or misleading statements and omissions of material fact concerning the Company's business, operations, and prospects. Specifically, the Individual Defendants misrepresented and/or failed to disclose, inter alia, that: (i) a substantial portion of the Company's reported optical wavelength "backlog" and "funnel" was unlikely to ever convert into paying customer revenue; (ii) the purported backlog and funnel consisted in large part of non-binding expressions of customer interest, from which Cogent released customers without obligation when it could not timely provision their orders; (iii) large numbers of customers in the purported backlog were unable or unwilling to accept delivery of wavelengths even when Cogent was in a position to provision them; (iv) as a result, customer demand for Cogent's optical wavelength services was materially weaker than represented; (v) the Company's wavelength business was not performing at the levels necessary to support Cogent's publicly stated revenue, margin, and $500 million wavelength run-rate targets, which lacked a reasonable basis; (vi) the Company's dividend payments exceeded its cash flow and depended on the Company incurring additional leverage, such that, as a result of the foregoing, the Company's long-standing dividend policy was unsustainable; (vii) Defendant Schaeffer's high-risk pledging activities exposed the Company to a material risk of forced sales that would further depress its stock price, contrary to the Audit Committee's assurance that such sales did not present a material risk; (viii) the Company failed to maintain adequate internal controls; and (ix) as a result of the foregoing, the Company's positive statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

11. As a direct and proximate result of the Individual Defendants' misconduct, the Company has been named as a defendant in the Securities Class Action, and has incurred, and

will continue to incur, significant costs, including legal fees, potential class-wide damages, and a loss of reputation and goodwill. In addition, while the price of Cogent stock was artificially inflated, the Individual Defendants caused the Company to repurchase its own shares, resulting in estimated overpayments of approximately $16.5 million.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a)(1), and Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9, under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and under Sections 10(b) and 21D of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78u-4(f).

13. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

14. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16. In connection with the acts, conduct, and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

17. This Court has personal jurisdiction over each Defendant because each Defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), and 28 U.S.C. §§ 1391 and 1401 because Cogent maintains its principal executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the dissemination of materially false and misleading information, occurred in this District, Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and the Securities Class Action is pending in this District.

**PARTIES**

19. Plaintiff Andrew Ward is a current shareholder of Cogent and has continuously held Cogent common stock at all relevant times.

20. Nominal Defendant Cogent is incorporated under the laws of Delaware, and its principal executive offices are located at 2450 N Street, N.W., Washington, D.C. 20037. The Company's common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "CCOI."

21. Defendant Schaeffer is the founder of Cogent and has served as the Company's CEO and President and as Chairman of the Board since the Company's founding. According to the Company's public filings, Defendant Schaeffer received total compensation of $12,680,860 in 2024 and $25,372,519 in 2025. During the Relevant Period, Defendant Schaeffer sold 1,624,000 shares of Cogent stock in voluntary sales for proceeds of approximately $89.1 million, and lenders seized and sold an additional 2,659,578 of his pledged shares for proceeds of approximately $82.5 million. Defendant Schaeffer is named as a defendant in the Securities Class Action.

22. Defendant Weed has served as the Company's Chief Financial Officer ("CFO") and Treasurer since April 2022. According to the Company's public filings, Defendant Weed received total compensation of $4,460,450 in 2024 and $4,828,550 in 2025. During the

Relevant Period, Defendant Weed sold 39,050 shares of Cogent stock for proceeds of approximately $1.9 million. Defendant Weed is named as a defendant in the Securities Class Action.

23. Defendant de Sa has served as a director of the Company since December 2021. Defendant de Sa serves as Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Compensation Committee. According to the Company's public filings, Defendant de Sa received total compensation of $400,009 in 2024 and $443,308 in 2025.

24. Defendant Brooks has served as a director of the Company since October 2003 and serves as a member of the Board's Audit Committee. According to the Company's public filings, Defendant Brooks received total compensation of $400,009 in 2024 and $443,308 in 2025.

25. Defendant Kennedy has served as a director of the Company since November 2019 and serves as a member of the Board's Audit Committee. According to the Company's public filings, Defendant Kennedy received total compensation of $400,009 in 2024 and $443,308 in 2025. During the Relevant Period, Defendant Kennedy sold 15,115 shares of Cogent stock for proceeds of approximately $690,229.

26. Defendant Montagner has served as a director of the Company since April 2010 and as the Board's Lead Independent Director since February 2020. Defendant Montagner serves as Chair of the Board's Compensation Committee. According to the Company's public filings, Defendant Montagner received total compensation of $399,009 in 2024 and $443,308 in 2025.

27. Defendant Ferguson has served as a director of the Company since October 2018. Defendant Ferguson serves as Chair of the Board's Audit Committee and as a member of the Nominating and Corporate Governance Committee. According to the Company's public

filings, Defendant Ferguson received total compensation of $400,009 in 2024 and $442,308 in 2025. During the Relevant Period, Defendant Ferguson sold 12,658 shares of Cogent stock for proceeds of approximately $550,329.

28. Defendant Howell has served as a director of the Company since May 2022 and serves as a member of the Board's Compensation Committee. According to the Company's public filings, Defendant Howell received total compensation of $399,009 in 2024 and $443,308 in 2025.

29. Defendant Howard has served as a director of the Company since June 2022 and serves as a member of the Board's Nominating and Corporate Governance Committee. According to the Company's public filings, Defendant Howard received total compensation of $400,009 in 2024 and $443,308 in 2025. During the Relevant Period, Defendant Howard sold 3,500 shares of Cogent stock for proceeds of approximately $287,070.

30. Defendant Bath served as a director of the Company from November 2006 until May 2025. According to the Company's public filings, Defendant Bath received total compensation of $397,009 in 2024 and $179,537 in 2025. During the Relevant Period, Defendant Bath sold 6,220 shares of Cogent stock for proceeds of approximately $520,552.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

31. By reason of their positions as officers and/or directors of Cogent, and because of their ability to control the business and corporate affairs of Cogent, the Individual Defendants owed Cogent and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Cogent in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Cogent and its shareholders.

32. Each director and officer of the Company owes to Cogent and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

33. The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and prospects of the Company.

34. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Cogent were required to, among other things:

> (a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the District of Columbia, and the United States, and pursuant to Cogent's Code of Conduct and Ethics;
>
> (b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;
>
> (c) remain informed as to how Cogent conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices;

> (d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Cogent and procedures for the reporting of the business and internal affairs to the Board, and periodically investigate, or cause independent investigation to be made of, said reports and records;
>
> (e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Cogent's operations would comply with all applicable laws and Cogent's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate; and
>
> (f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate, and refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

35. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

## THE CODE OF CONDUCT AND ETHICS

36. Cogent maintains a Code of Conduct and Ethics (the "Code of Conduct"), which "govern[s] the conduct and responsibilities of the directors, officers and employees of the Company and its subsidiaries."

37. The Code of Conduct provides that all directors, officers, and employees of the Company and its subsidiaries must, in relevant part:

> 1) act with honesty and integrity and shall use due care and diligence in performing their responsibilities to the Company.
>
> 2) avoid situations that represent actual or apparent conflicts of interest with their responsibilities to the Company and shall promptly disclose to the Chief Legal Officer or the chairman of the Audit Committee any transaction or personal or professional relationship that reasonably could be expected to give rise to such an actual or apparent conflict.
>
> 3) provide the board of directors, auditors, regulatory agencies and others, as necessary, with information that is accurate, complete, fair, relevant, timely and understandable, including information for inclusion in the Company's public statements or in submissions to governmental agencies.
>
> 4) comply with applicable laws, rules and regulations, the rules of any applicable public or private regulatory and listing authorities and the policies and procedures established by the Company.
>
> * * *
>
> 6) respect and safeguard the confidentiality of information acquired in the course of their work except as authorized or legally obligated to disclose such information. Confidential information acquired in the course of an individual's work for the Company shall not be used for personal advantage.
>
> * * *
>
> 9) maintain control over and use for the benefit of the Company all Company assets and resources entrusted to them.

38. The Individual Defendants violated the Code of Conduct by causing and/or permitting the Company to issue the materially false and misleading statements alleged herein, by failing to provide accurate, complete, and fair information for inclusion in the Company's public statements, and, as to the Insider Trading Defendants (defined below), by using confidential Company information for personal advantage.

## THE AUDIT COMMITTEE CHARTER

39. Cogent's Audit Committee Charter states that the purpose of the Audit Committee is to "assist the Board with its oversight responsibilities regarding (i) the integrity

of the Company's financial statements and audits thereof, (ii) the independent auditor's qualifications, independence and performance and (iii) the Company's accounting and financial reporting processes."

40. The Audit Committee Charter provides that the Audit Committee has the following "[p]owers and [r]esponsibilities," among others:

> 3. Investigations. The Committee may conduct or authorize, if it considers appropriate, investigations into any matters within the scope of the powers and responsibilities delegated to the Committee. . . .
>
> * * *
>
> 10. Meetings with Management and the Independent Auditor. The Committee shall review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." . . .
>
> * * *
>
> 15. The Committee shall have oversight of any enterprise risk assessments by management concerning reviews of primary risks facing the Company, including environmental and sustainability risks, and the Company's associated risk mitigation measures.
>
> * * *
>
> 18. The Committee shall consider any correspondence from or with regulators or governmental agencies, any employee complaints, any legal matters or any published reports that raise material issues regarding the Company's financial statements, financial reporting process, accounting policies or internal audit function. Where the Committee believes additional review, investigation, or action is necessary it shall do so. . . .
>
> * * *
>
> 22. The Committee, through its Chair, shall report regularly to, and review with, the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the performance and independence of the Company's independent auditor, or any other matter the Committee determines is necessary or advisable to report to the Board.

41. The Audit Committee Charter further provides that the Committee "shall also be responsible for the oversight and review of compliance with the Company's Hedging, Derivatives and Pledging Policy, including, without limitation, the initial approval and following periodic review of any pledging of Company securities[.]" As alleged below, the Audit Committee purportedly reviewed Defendant Schaeffer's share-pledging obligations on a quarterly basis. Defendants Ferguson, Brooks, and Kennedy, as members of the Audit Committee, failed to discharge these responsibilities by permitting the Company to issue the materially false and misleading statements alleged herein and by allowing Defendant Schaeffer's pledging to exceed the limits of the Company's own pledging policy.

## SUBSTANTIVE ALLEGATIONS

### Background

42. Headquartered in Washington, D.C., Cogent serves three customer bases: (i) corporate customers located in multi-tenant office buildings, such as law firms, financial services firms, and other professional services businesses; (ii) net-centric customers, including other internet service providers, telephone companies, mobile operators, cable television companies, and bandwidth-intensive users; and (iii) enterprise customers, which are large corporations that run Wide Area Networks with several dozen to several hundred sites.

43. Historically, including prior to and throughout the Relevant Period, Cogent paid quarterly dividends that consistently increased quarter after quarter. The dividend was a significant factor in attracting and retaining investors, given its consistent growth and its high yield, which was 5.5% in 2024 and 9.2% during 2025. During the Relevant Period, the Individual Defendants highlighted the number of consecutive quarters in which the Company had increased its dividend. The Company had increased its dividend for fifty-two consecutive quarters, or thirteen years, until the dividend was slashed during the Relevant Period, as detailed herein.

**The Acquisition and Cogent's Optical Wavelength Business**

44. On September 7, 2022, the Company announced its agreement to acquire T-Mobile's Wireline business. Through the Acquisition, Cogent would acquire approximately 19,000 long-haul route miles of fiber, 1,300 miles of metro fiber, and 16,800 route miles of leased dark fiber, as well as hundreds of buildings and technical sites with significant power capacity and a sizeable customer base that included many large enterprise customers.

45. The Wireline business had been part of Sprint Corporation ("Sprint") before Sprint's 2020 merger with T-Mobile. Historically, the Wireline business provided wireline communication services to domestic and international customers and supported the operation of Sprint's CDMA and LTE cellular networks. During the first half of 2022, T-Mobile retired those cellular networks and confirmed that it no longer relied on the Sprint network to support its wireless business. Shortly thereafter, T-Mobile and Cogent agreed to the Acquisition.

46. Despite the unprofitability of the Wireline business, the Individual Defendants touted the Acquisition and assured investors that the Company would manage the declining business by pruning unprofitable contracts, increasing operational efficiencies, and repurposing the acquired physical assets to meet emerging demand for high-margin optical wavelength and transport services.[2] Between the announcement of the Acquisition and its closing on May 1, 2023, the Company represented that it was on track to achieve annual revenue growth of 5% to 7% and set an aggregate revenue target of over $1.5 billion to be reached by mid-2028.

47. Among other purported benefits, the Individual Defendants represented that the Acquisition would give Cogent entry into the North American market for high-margin optical wavelengths, which was then estimated at $2 billion annually and expected to grow at 7% per

[2]Optical wavelengths are light channels that transmit data in fiber optic networks and are used for high-bandwidth, low-latency point-to-point data transmission.

year for the following six years; would provide more than 400 buildings and technical sites, more than 40 of which could be repurposed as data center facilities to support the new wavelength business; would be accretive to EBITDA per share and cash flow per share over a multi-year period; and would "strengthen Cogent's commitment to sustaining its record of sequential dividend growth."

48. The Individual Defendants stated that the key to achieving these targets was the Company's new optical wavelength business. During the earnings call to discuss the Company's financial results for the third quarter of 2022, Defendant Schaeffer stated, in relevant part:

> But the real meteoric growth in the combined business will come from our ability to sell the optical transport products or wavelengths. Today that is only an $8 million business [at Sprint]. . . . [W]e anticipate that within 5 years of closing, we can grow that to a $400 million business.

49. On November 9, 2023, during the earnings call for the third quarter of 2023, Defendant Schaeffer increased the Company's wavelength expectations, stating:

> And then to go to answer your question around a 5-year target, and I'm going to use 5 years from closing. So May of '23 to May of '28. We anticipate being on a run rate for wavelength sales of approximately $500 million and a total run rate for the combined business in excess of $1.5 billion, up from the $1.1 billion of $1.150 billion, $1.2 billion that we're running at right now.

50. Because the Company was highly leveraged, Cogent had a very limited margin for error, and the success of its new optical wavelength business was critical to preserving its credit rating and maintaining its dividend policy. As of September 30, 2022, Cogent reported a gross leverage ratio of 5.31x and a net leverage ratio of 3.93x, with total debt of approximately $1.24 billion and net debt of $914 million against trailing twelve-month adjusted EBITDA of approximately $233 million. As of March 31, 2023, the quarter before the Acquisition closed,

gross leverage had increased to 5.47x and net leverage to 4.46x, with total debt of approximately $1.27 billion and net debt of $1.04 billion.

51. Cogent's turnaround plan for the Wireline business was costly and time-consuming. It required tens of millions of dollars of Company investment in network reconfiguration, facility conversions, and optimizations designed to enable wavelength sales with improved "provisioning" times, which Cogent hoped to reduce from more than 120 days to 14 days.

**Defendant Schaeffer's Personal Dependence on Cogent's Stock Price**

52. Defendant Schaeffer was personally highly leveraged and uniquely dependent on the price of Cogent shares. In 2024, Defendant Schaeffer received total compensation of $12,680,860, consisting of $185,760 in cash incentive compensation linked to Cogent's optical wavelength sales, restricted stock awards ("RSAs") with an aggregate grant-date fair value of $12,489,000, and $6,100 in other compensation. The RSAs comprised 84,000 time-based shares vesting in twelve equal monthly increments beginning January 1, 2027, and up to 96,000 performance-based shares eligible to vest on April 1, 2027. Half of the performance-based award was tied to EBITDA growth and half to relative total shareholder return, measured over the performance period from January 1, 2024 through December 31, 2026.

53. Defendant Schaeffer's personal holdings consisted principally of two assets: (i) Cogent stock, representing approximately 10% of the Company's outstanding shares as of February 28, 2024; and (ii) a commercial real estate portfolio consisting mostly of Washington, D.C.-area office buildings. Defendant Schaeffer pledged many of his Cogent shares as collateral for margin loans that supported his real estate portfolio and covered the taxes on his Cogent stock awards. The value of his real estate portfolio declined from approximately $1.1 billion in 2022 to approximately $500 million by mid-2025. If the price of Cogent stock fell

significantly, Defendant Schaeffer risked a margin call that could require the rapid sale of large amounts of Cogent stock.

54. The Company's proxy statements filed on Schedule 14A with the SEC on March 25, 2024 (the "2024 Proxy") and March 26, 2025 (the "2025 Proxy") each acknowledged that "a pledge of a significant number of shares of the Company's stock poses a risk to the Company and its other stockholders should a lender foreclose on the pledged shares and sell all or a significant portion of them in a manner that disrupts the market for the shares."

55. To mitigate this risk, the Audit Committee purportedly reviewed Defendant Schaeffer's pledging obligations quarterly and conducted due diligence on his real estate holdings. The Company's pledging policy generally prohibited pledges exceeding 5% of its outstanding shares on a fully diluted basis or 50% of an executive's personal Cogent holdings, but permitted exceptions in exceptional circumstances. The pre-approval process also considered the other assets securing the full recourse loans and the amount of the loans relative to the individual's financial condition. The 2025 Proxy expressly disclosed that, as of March 1, 2025, Defendant Schaeffer had pledged 2,713,000 shares, representing 5.5% of the Company's fully diluted outstanding shares and approximately 60% of his holdings. It further disclosed that the Audit Committee recognized that he remained above the policy's targets but did not require him to reduce the pledged shares. Despite permitting these exceptions, the Audit Committee assured shareholders that "there was not a material risk that he could be forced to sell Cogent shares involuntarily." Plaintiff challenges the adequacy of that risk assessment and assurance, rather than alleging that the pledged amounts or the exceptions were undisclosed.

**The Board Undertook to Monitor the Integration and the Company's Dividend Capacity**

56. The Board did not merely possess general authority over the matters at issue; it publicly undertook to monitor them. In its letter to stockholders in the 2024 Proxy, the Board represented that, "[s]ince May 2023, the Board . . . has carefully monitored the Company's

progress on its post-closing integration plans in order to realize the projected synergies of the Sprint acquisition," and that "the Board will continue to monitor closely the progress of the integration of the Sprint assets." In the 2025 Proxy, in a letter to stockholders signed by Defendant Montagner as Lead Independent Director, the Board represented that it "remains committed to realizing the opportunities created by the Sprint acquisition through both the enhancement of the value of the acquired assets through the sale of new and expanded services and the realization of the projected cost-reduction and other synergies," and that "in 2025 the Board will continue to monitor the remaining integration efforts and support management efforts to grow revenue, EBITDA and free cash flow."

57. The Board also tied Defendant Schaeffer's compensation directly to the wavelength business. According to the 2025 Proxy, all of Defendant Schaeffer's 2024 cash compensation was "performance-based determined by optical wave and optical transport services revenue," and the Board amended the metrics for Defendant Schaeffer's 2025 annual cash compensation goal "to include gross profit, and the sale of optical wave and optical transport services." The Board, and in particular the members of the Compensation Committee, therefore received and evaluated information concerning the Company's actual wavelength sales in setting and paying that compensation.

58. The 2025 Proxy further disclosed that the Audit Committee's responsibilities include "reviewing our critical accounting policies, our Annual and Quarterly reports on Forms 10-K and 10-Q, and our earnings releases," and that, during 2024, the Board met seven times and the Audit Committee met four times.

59. The Company's periodic reports identified Defendant Schaeffer as Cogent's Chief Operating Decision Maker ("CODM"). As CODM, Defendant Schaeffer was responsible for assessing the Company's performance and deciding how to allocate its resources, and he regularly reviewed documents reflecting the Company's service revenue, network operations

expenses, selling, general, and administrative expenses, interest expenses, and net income or loss. The Company's annual reports on Form 10-K further represented that Cogent maintained disclosure controls and procedures designed to ensure that information required to be disclosed was accumulated and communicated to Defendants Schaeffer and Weed, as appropriate, to allow timely decisions regarding required disclosure.

60. With respect to the dividend, the Company's annual report on Form 10-K for the year ended December 31, 2024, which every member of the Board signed, represented that "our executive officers and Board of Directors have continued to carefully monitor our liquidity and cash requirements as well as our capital spending." The Company's earnings releases confirm that the Board itself approved each quarterly dividend, including the increases approved on February 26, 2025, May 7, 2025, and August 6, 2025, and the reduction approved on November 5, 2025. The Board was therefore positioned to know, and was charged with knowing, whether the Company's cash flow and leverage could support its dividend policy.

61. The Board approved these dividends even though the Company's operations were not generating the cash to pay them. According to the Company's quarterly summaries of financial and operational results, which were filed with the SEC as part of its earnings releases, from the first quarter of 2024 through the second quarter of 2025 the Company's net cash provided by (used in) operating activities totaled approximately negative $16.3 million, while the Company paid approximately $288.1 million in dividends and spent approximately $309.3 million on capital expenditures. In the second quarter of 2025 alone, the Company used $44.0 million of cash in its operating activities and paid $49.6 million in dividends. As Defendant Schaeffer acknowledged on August 7, 2025, "it has been Cogent's policy since 2010 to return more than 100% of free cash flow."

**Materially False and Misleading Statements Issued During the Relevant Period**

62. On February 29, 2024, the Company issued a press release announcing its financial results for the fourth quarter and full year 2023 and held an associated earnings call for investors and analysts (the "4Q23 Earnings Call"). During the 4Q23 Earnings Call, Defendant Schaeffer touted the Company's "significant funnel of wavelength orders," stating, in relevant part:

> As of today, we are selling wavelength services in 65 carrier neutral data centers. With expended provisioning cycles, we can also sell wavelengths and an additional 285 carrier neutral data centers or a total of 360 facilities across North America. We're generating $3.3 million of revenue from wavelength sales in the previous quarter with 667 discreet installed wavelengths.
>
> We have a significant funnel of wavelength orders in the pipeline. Today, we have a combination of orders signed as well as in our sales funnel of over 2,300 orders.

63. During the question-and-answer portion of the 4Q23 Earnings Call, in response to a question about the Company's prior statement that wavelength sales would be approximately $20 million per quarter by mid-year, Defendant Schaeffer stated, in relevant part:

> The backlog has more than doubled sequentially in the quarter. So on the third quarter earnings call, our backlog was approximately a thousand orders in the sales funnel and provisioning funnel that number is up to approximately 2,300. We actually anticipate, based on information from the sales force and our conversations with customers, that we're going to continue to see an acceleration in the order value. . . .
>
> There are over a thousand of our 2000 employees who are almost completely full-time focused on this effort. We absolutely will meet the year end targets, but I think by mid-year the funnel will demonstrate that run rate, but it probably will not be provisioned due to these extended provisioning windows in those 285 sites.

64. When asked whether Cogent would be able to get through "that 2,300-order backlog by the end of the year," Defendant Schaeffer assured investors that the Company would "provision most of those orders," stating, in relevant part:

> So Evan, I think two different things will happen. We will provision most of those orders, but there will be some customers who cannot wait. We are trying to be very transparent with customers, and it's a site-by-site discussion on what that provisioning window will look like.
>
> We know that with the network reconfigurations that we have going on, we'll have more than double the number of sites and a standardized provisioning window by year end. But in the intervening time, if a customer needs to go somewhere else and we can't provision, we are going to let them out of that obligation. I mean, if we want to do business with them going forward, we need to understand that this is a Cogent problem and not the customer's problem.
>
> Conversely, as we continue to build credibility with customers and we get more sites enabled and shorter provisioning windows, we actually anticipate the pace of that funnel building actually accelerating. In the last quarter, it took us basically five months from closing to build a funnel of 1,000. In the last quarter, we got that up to 2,300. And yes, there have been some ball-out, but the net number grew, and I think that will continue to grow.
>
> As I stated earlier, over the long run, I think it's not healthy to talk about funnels but install revenue. But until we get the network configured correctly and get enough sites where we can provision in an expeditious manner of a couple of weeks, we have to give both customers and investors an understanding of what the backlog looks like.

65. Defendant Schaeffer thus knew from the outset of the Relevant Period that the "orders" in the backlog were not firm commitments. Cogent was in direct, "site-by-site" communication with the customers in the funnel and was prepared to "let them out of that obligation" whenever it could not provision their orders. Even while acknowledging that "it's not healthy to talk about funnels," Defendant Schaeffer chose to present the funnel to investors as a measure of customer demand.

66. Defendant Schaeffer also reiterated the Company's long-term targets, stating that "we anticipate our long-term average revenue growth to remain between 5% and 7% annually. And we expect our EBITDA margins as adjusted to increase by approximately 100 basis points annually."

67. Also on February 29, 2024, the Company filed its annual report on Form 10-K for the year ended December 31, 2023 with the SEC (the "2023 10-K"). The 2023 10-K was signed by Defendants Schaeffer, Weed, de Sa, Brooks, Kennedy, Bath, Montagner, Ferguson, Howell, and Howard, and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Schaeffer and Weed, attesting that the information contained therein "fairly presents, in all material respects, the financial condition and results of operations of the Company."

68. The 2023 10-K touted that the Company's revenue growth would be driven by the wavelength business, stating:

> Management intends to reduce the negative cash flow of the Sprint Business through the payments from the IP Transit Services Agreement, reducing operating costs and increasing revenue primarily by providing optical wavelength and optical transport services over our fiber network, including the owned network we acquired with the Sprint Business.

69. The 2023 10-K further assured investors that the Company would continue its dividend policy and had the financial wherewithal to do so, stating:

> Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $379 million in order to meet our expected quarterly dividend payments over the next two years. . . . Based on current circumstances, we currently plan to continue our current dividend policy.
>
> * * *
>
> We believe that our cash on hand and cash generated from our operating activities and cash from the IP Transit Services Agreement will be adequate to meet our working capital, capital expenditure, debt service, dividend payments and other cash requirements for the next twelve months and beyond the next twelve months if we execute our business plan.

70. The 2023 10-K purported to warn of risks relating to the Acquisition, which "may" impact the Company, stating that "[w]e may not realize the anticipated benefits of the acquisition of the Sprint Business, and the integration of the Sprint Business may disrupt our

business and management," and that the Company "may not succeed" in adding customers. These purported risk warnings were themselves misleading because the risks had already materialized: the Company was already experiencing difficulty converting and retaining customers for its optical wavelength services, and the vast majority of its claimed backlog would never become paying revenue.

71. On May 9, 2024, the Company issued a press release announcing its financial results for the first quarter of 2024, reporting wavelength revenue of $3.3 million and an increase in wavelength customer connections to 693. On the associated earnings call (the "1Q24 Earnings Call"), Defendant Schaeffer touted that Cogent's backlog was growing, stating:

> We have a significant backlog and funnel of over 2,400 wavelength opportunities. However, due to these longer provisioning cycles, we are uncertain if all of these orders will remain with us through our ability to provision them. We will be able to reduce that provisioning cycle as we complete our network optimization and mirror the provisioning windows that we are able to achieve in our IP business.

72. Defendant Schaeffer further highlighted that customer demand was "stronger than we had initially expected," stating, in relevant part:

> So first of all, on wavelengths, we continue to grow our funnel. We're actually trying to discourage customers until we can give them more realistic provisioning time lines. The demand for the routes that we have and the data centers that we are targeting is stronger than we had initially expected. As we outlined, we anticipate the wave business to be about a $500 million run rate business five years after the acquisition.
>
> * * *
>
> What we discovered as we began selling was that the wave demand was much more diffused across a much larger number of data centers. It's not that the demand is not there. It's just spread out into facilities that we could not provision. So we do still believe that there will be a $500 million business by run rate of May of '28.

73. Also on May 9, 2024, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2024 with the SEC (the "1Q24 10-Q"). The 1Q24 10-Q was signed by Defendants Schaeffer and Weed and contained SOX certifications, signed by Defendants Schaeffer and Weed, attesting to the accuracy of the statements contained therein. The 1Q24 10-Q stated that the Company expected to require approximately $382 million to meet its expected quarterly dividend payments over the next two years and that, "[b]ased on current circumstances, we currently plan to continue our current dividend policy," and repeated the 2023 10-K's statement that the Company's cash would be adequate to meet its "dividend payments and other cash requirements."

74. On August 8, 2024, the Company issued a press release announcing its financial results for the second quarter of 2024, reporting wavelength revenue of $3.6 million and an increase in wavelength customer connections from 693 to 754. On the associated earnings call (the "2Q24 Earnings Call"), Defendant Schaeffer stated that the Company expected wavelength revenue "to materially accelerate starting in early 2025 as we will complete the network integration and optimization for wave services by year-end." Defendant Schaeffer further stated:

> We have sold wavelengths in 156 locations. By year-end 2024, we expect to be able to offer wavelength services in over 800 North American locations with substantially reduced provisioning cycles. We have a significant backlog and funnel of wave opportunities, representing over 2,700 unique wavelengths.
>
> * * *
>
> We are enthusiastic and optimistic about the addition of optical transport services or wavelengths to our product portfolio and the expansion of our data center footprint.
>
> We have a significant backlog and funnel of these wave opportunities at over 2,700 discrete wavelengths. And while we have accentuated provisioning cycles, we hope that with the network reconfiguration work, we can bring these orders installed in much shorter times by year-end.

75. Also on August 8, 2024, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2024 with the SEC (the "2Q24 10-Q"), signed by Defendants Schaeffer and Weed and containing SOX certifications signed by them. The 2Q24 10-Q stated that the Company expected to require approximately $386 million to meet its expected dividend payments over the next two years, that it "currently plan[ned] to continue our current dividend policy," and repeated the same liquidity statement.

76. On November 7, 2024, the Company issued a press release announcing its financial results for the third quarter of 2024, reporting wavelength revenue of $5.3 million and an increase in wavelength customer connections from 754 to 1,041. On the associated earnings call (the "3Q24 Earnings Call"), Defendant Schaeffer touted the Company's wavelength backlog, stating:

> By the end of 2024, we expect to be able to offer wavelength services in over 800 locations with a much more rapid provisioning cycle. We have a backlog and funnel of wave opportunities of over 3,400 unique wavelengths.
>
> * * *
>
> We have a significant wavelength backlog, a funnel of over 3,400 wavelength opportunities. However, due to our longer provisioning cycles, we are not sure all of these orders will, in fact, be installed. We will substantially reduce that provisioning window by quarter end.

77. While Defendant Schaeffer purported to acknowledge that "not . . . all" of the orders would be installed, he gave investors no indication that the vast majority of the backlog was, as would later be admitted, illusory. On the day of the 3Q24 Earnings Call, the price of Cogent stock reached an intraday Relevant Period high of $86.76 per share.

78. Defendant Schaeffer's statements on the 3Q24 Earnings Call also confirm his direct knowledge of the condition of the backlog. He stated, in pertinent part:

> We continue to talk to the customers that are in our backlog. And if we can accelerate certain of those orders, we will. We also know that some of those orders have been sitting for months. We

> have tried to be very transparent with customers in terms of our limitations on hitting what we view as acceptable provisioning windows.

79. On the same call, Defendant Weed discussed the Company's optical wavelength revenue and its capital expenditures relating to the integration of the assets acquired from T-Mobile.

80. Also on November 7, 2024, the Company filed its quarterly report on Form 10-Q for the period ended September 30, 2024 with the SEC (the "3Q24 10-Q"), signed by Defendants Schaeffer and Weed and containing SOX certifications signed by them. The 3Q24 10-Q again stated that the Company expected to require approximately $386 million to meet its expected dividend payments over the next two years, that it "currently plan[ned] to continue our current dividend policy," and repeated the same liquidity statement.

81. The statements referenced in ¶¶ 62-80 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading because, inter alia: (i) a substantial portion of the Company's reported optical wavelength "backlog" and "funnel" was unlikely to ever convert into paying customer revenue; (ii) the purported backlog and funnel consisted in large part of non-binding expressions of customer interest, from which Cogent released customers without obligation when it could not timely provision their orders; (iii) large numbers of customers in the purported backlog were unable or unwilling to accept delivery of wavelengths even when Cogent was in a position to provision them; (iv) as a result, customer demand for Cogent's optical wavelength services was materially weaker than represented; (v) the Company's wavelength business was not performing at the levels necessary to support Cogent's publicly stated revenue, margin, and $500 million wavelength run-rate targets, which lacked a reasonable basis; (vi) the Company's dividend payments exceeded its cash flow and depended on the Company incurring additional leverage, such that, as a result of the foregoing, the Company's long-standing dividend policy

was unsustainable; (vii) Defendant Schaeffer's high-risk pledging activities exposed the Company to a material risk of forced sales that would further depress its stock price, contrary to the Audit Committee's assurance that such sales did not present a material risk; (viii) the Company failed to maintain adequate internal controls; and (ix) as a result of the foregoing, the Company's positive statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins to Emerge**

82. The truth began to emerge on February 27, 2025, when the Company issued a press release announcing its financial results for the fourth quarter and full year 2024 and held an associated earnings call (the "4Q24 Earnings Call"). The Company reported that wavelength customer connections increased from only 1,041 to 1,118, a sharp slowdown from 287 net additions in the third quarter of 2024 to just 77 net additions in the fourth quarter. It was also revealed that Cogent's annual wavelength revenue run rate was only approximately $28 million, a far cry from the $500 million target, and that its backlog had declined sequentially from 3,400 to 2,700. Management explained that the Company had removed 1,500 orders from the funnel because many of them were more than a year old. At the same time, the Company disclosed that it had reached its target of 800 wave-enabled data centers and had reduced its provisioning cycle to 30 days, from 90 days in the third quarter of 2024 and 120 days in the second quarter of 2024.

83. On this news, the price of Cogent stock declined $7.65 per share, or approximately 10%, from a closing price of $80.11 per share on February 26, 2025 to a closing price of $72.46 per share on February 27, 2025.

84. Analysts reacted swiftly. A TD Cowen analyst reported that "shares [were] pulled back likely on the weak Waves bookings," noting that "Cogent's Wavelength backlog decreased from 3,400 to 2,700 as mgmt. noted that it kicked out 1,500 connections from the

funnel as they became stale and presumably found business elsewhere," and that "Cogent's prior messaging that it could add 500 connections per month has now become a 'show me' having added just 77 connections in 4Q24." A Wells Fargo analyst similarly observed that "wavelength revenues [were] improving at a slower-than-hoped rate."

85. Despite these disappointing results, the Individual Defendants continued to obfuscate the truth. During the 4Q24 Earnings Call, Defendant Schaeffer attributed the decline in the backlog to "grooming," stating:

> We have a significant backlog and funnel of over 2,700 opportunities. While this is down slightly from the previous quarter, it's been due to grooming that funnel. Many of those opportunities have been in the funnel for over a year as we could not provision them.
>
> But now with the ubiquitous coverage and the more rapid provisioning cycles, we believe that we will continue to accelerate our wavelength business. We do have reduced provisioning cycles, and we hope to convert many of these opportunities and funnel into installed orders.

86. Defendant Schaeffer further represented that installations would soon reach 500 per month and that new order intake would accelerate, stating, in relevant part:

> With regard to the pacing of installs, we are ramping up to our full install capabilities. And we have both the field resources and service delivery coordinators to support the 500 a month. The hard part now has been working through the backlog that we have and flushing out which orders are still available for install and in which the customers had to go somewhere else. And some of these orders have been in the funnel for over a year. And that is a time-consuming process.
>
> And we have groomed the funnel. It did shrink, even though there were some new orders coming into the funnel. And now, we expect the funnel to actually accelerate in new order intake as we have demonstrated our ability to install.

87. Defendant Schaeffer further assured investors that the Company remained on track to meet its $500 million target, stating:

> We feel very comfortable about the target that we laid out at the closing of the deal in May of '23 and said within five years, we would be at a run rate of $500 million annually in wavelength sales. We think that the demand that we have received both in terms of order backlog and continued customer interest gives us a great deal of confidence we're going to make that number, particularly as we prove to the market our ability to actually deliver.
>
> * * *
>
> But we're very comfortable with our $500 million by mid-'28 target for wavelength revenue.

88. On February 28, 2025, the Company filed its annual report on Form 10-K for the year ended December 31, 2024 with the SEC (the "2024 10-K"). The 2024 10-K was signed by Defendants Schaeffer, Weed, de Sa, Brooks, Kennedy, Bath, Montagner, Ferguson, Howell, and Howard, and contained SOX certifications signed by Defendants Schaeffer and Weed. The 2024 10-K provided, in relevant part:

> Based upon the historical growth rate of our dividend, we expect that we would have to provide approximately $399 million in order to meet our expected quarterly dividend payments over the next two years. . . .
>
> In light of the economic uncertainties associated with the global economy, evolving hybrid work arrangements, the cash flow requirements of the Sprint Business, and the uncertain impact of proposed changes to economic and fiscal policies in the United States and other countries, our executive officers and Board of Directors have continued to carefully monitor our liquidity and cash requirements as well as our capital spending. After consideration of these circumstances, we currently plan to continue our current dividend policy.

89. The 2024 10-K also repeated the same liquidity statement.

90. The statements referenced in ¶¶ 85-89 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading for the reasons set forth in ¶ 81.

91. On March 21, 2025, S&P Global Ratings ("S&P") revised its outlook for Cogent Communications Group LLC, Cogent's primary operating entity, from stable to

negative on weaker credit metrics, citing concern that Cogent's leverage would remain above S&P's downgrade trigger of 5.25x in 2025 and that growth in Cogent's wavelength business was mostly offset by elevated expenses.

92. The truth was further revealed on May 8, 2025, when the Company issued a press release announcing its financial results for the first quarter of 2025 and held an associated earnings call (the "1Q25 Earnings Call"). Although the Company had expanded its wavelength offering to 883 data centers, wavelength revenue increased by only $200,000 from the prior quarter, to $7.1 million. During the 1Q25 Earnings Call, Defendant Schaeffer admitted that "nearly 90% of the total funnel that existed at the end of Q3 2024 fell out," and that this outcome was "as expected" because "[t]hose customers went elsewhere, because they could not wait for our deliveries." Defendant Schaeffer further conceded that, although Cogent had the capacity to provision 500 orders per month, a 5% conversion rate on its funnel would yield only "about 160" installations per month, such that "we have more installation capacity than orders that are ready to install."

93. On this news, the price of Cogent stock declined $3.91 per share, or approximately 7%, from a closing price of $53.21 per share on May 7, 2025 to a closing price of $49.30 per share on May 8, 2025.

94. A J.P. Morgan analyst attributed the decline to wavelength results, noting that "equity investors were underwhelmed with the company's progress on selling wavelength services," while an Oppenheimer analyst observed that "[w]avelengths remain [the] key to revenue acceleration and margin expansion," and a Deutsche Bank analyst noted that "[w]avelength sales growth was lackluster for a second quarter in a row which is somewhat concerning as this is the offset story to inherited Sprint losses."

95. Yet during the same call, Defendant Schaeffer assured investors that the Company's backlog had been rebuilt and that Cogent remained on track to capture its targeted market share, stating, in relevant part:

> We have provisioned and cleaned up our former backlog of wavelength orders. We currently have a backlog and funnel of 3,433 wavelength opportunities. With more wave provisioning experience and the actual ability to deliver services, we now anticipate that between 4% and 5% of this funnel will be installed each month going forward. We also expect based on the growth in the sales activity that by year-end, there will be 10,000 unique Wave opportunities in our funnel. We currently have provisioning capacity to install 500 waves per month. We intend to capture 25% of this highly concentrated North American market within three years.
>
> * * *
>
> The funnel that we have now of 3,433 orders is a completely rebuilt funnel that was rebuilt from the end of Q3 2024 to the end of Q1 2025. We now have much more clarity around locations and about timing to be able to install.

96. Defendant Schaeffer also raised the Company's long-term guidance, stating that "we are adjusting our long-term annual revenue growth rates to 6% to 8%, and we are increasing the rate at which we anticipate our EBITDA as adjusted margin to expand annually to 150 basis points."

97. Also on May 8, 2025, the Company filed its quarterly report on Form 10-Q for the period ended March 31, 2025 with the SEC (the "1Q25 10-Q"), signed by Defendants Schaeffer and Weed and containing SOX certifications signed by them. The 1Q25 10-Q stated that the Company expected to require approximately $397 million to meet its expected dividend payments over the next two years, that it "currently plan[ned] to continue our current dividend policy," and repeated the same liquidity statement.

98. The statements referenced in ¶¶ 95-97 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading for the reasons set forth in ¶ 81.

99. On August 7, 2025, the Company issued a press release announcing its financial results for the second quarter of 2025 and held an associated earnings call (the "2Q25 Earnings Call"). The Company added only 147 net wavelength connections during the quarter, far fewer than the approximately 155 installations per month implied by the Individual Defendants' prior representation that 4% to 5% of the 3,433-order funnel would be installed each month. Defendant Schaeffer disclosed that "[w]e have several hundred wavelengths that have been installed but have not yet [billed] due to customers' inability to accept the services." The Company also disclosed that its gross leverage ratio had increased to 8.65x from 6.69x in the prior quarter and its net leverage ratio to 7.52x from 6.08x.

100. On this news, the price of Cogent stock declined $8.54 per share, or approximately 19%, from a closing price of $43.88 per share on August 6, 2025 to a closing price of $35.34 per share on August 7, 2025, and declined an additional $4.72 per share, or approximately 13%, to a closing price of $30.62 per share on August 8, 2025.

101. Materially contributing to these declines, on August 7 and 8, 2025, lenders at JPMorgan Chase & Co. and Royal Bank of Canada seized 2,659,578 shares of Cogent stock that Defendant Schaeffer had pledged as collateral and sold them for a total of approximately $82.5 million. As Defendant Schaeffer later acknowledged, his pledge of shares "created a cascade of bad events." By the end of 2025, Defendant Schaeffer's ownership of Cogent had fallen from approximately 10% to approximately 1.5%, and he had forfeited his interests in several buildings due to defaults. The very risk that the Board and the Audit Committee had assured investors was not "material" had come to pass.

102. During the 2Q25 Earnings Call, held on the first day of the forced sale, an analyst asked Defendant Schaeffer whether the Board had "put any limitation" on his pledged stock and whether there was "a cap on what you can pledge." Defendant Schaeffer responded:

"There is not at Cogent." When the analyst asked "[w]ho in the Board makes that decision," Defendant Schaeffer answered: "The Audit Committee."

103. Defendant Schaeffer's answer confirms that the Audit Committee, composed of Defendants Ferguson, Brooks, and Kennedy, was responsible for the pledging decisions at issue. As expressly disclosed in the 2025 Proxy, the Committee permitted Defendant Schaeffer's pledges to remain above the policy's percentage targets. Plaintiff alleges that the Committee failed adequately to assess and address the risk posed by those pledges and misleadingly assured shareholders that there was no material risk of involuntary sales. The forced liquidation of Defendant Schaeffer's pledged shares in August 2025 was the realization of that risk.

104. Analysts again reacted negatively. A BofA Securities analyst wrote that "[w]avelength delays take the full spotlight of the 2Q print" and that "the company quarterly dividend payout is unsustainable at current operating and leverage trajectory." A J.P. Morgan analyst cut its mid-2028 wavelength estimate to $160 million, versus management's $500 million target, and warned of "fears of a pending dividend cut in the coming quarters." The J.P. Morgan analyst also stated, "we question CCOI's decision to begin buying back stock given leverage (6.6x on an adjusted basis exiting 2Q25) and liquidity concerns, and also believe it would be prudent for the company to pause its dividend growth." On August 14, 2025, S&P downgraded Cogent Communications Group LLC's issuer credit rating from B+ to B, citing, among other things, wavelength sales that had underperformed expectations.

105. On August 15, 2025, the Company disclosed in a Form 8-K filed with the SEC that, on August 11, 2025, four days after the 2Q25 Earnings Call and one business day after lenders finished liquidating Defendant Schaeffer's pledged shares, James Bubeck, Cogent's Vice President of Global Sales and Chief Revenue Officer, had notified the Company of his intent to retire, effective September 2, 2025. When the Company reported its second quarter

2025 results only days earlier, it gave no indication that Mr. Bubeck would be leaving. The abrupt departure of the senior officer responsible for the Company's sales, who had direct knowledge of the true composition of the wavelength backlog and funnel, was a further red flag to the Board.

106. Nevertheless, during the 2Q25 Earnings Call, Defendant Schaeffer reported a "backlog and funnel of 4,687 wavelength opportunities," and in response to an analyst's question regarding the $500 million target, stated:

> So first of all, on the confidence on wavelengths, we are actually more confident today than we were on last quarter's call or the quarter before or since we acquired Sprint. The reception that we have received from the customer base, the orders that we have in our funnel and the customer feedback that we've gotten from the orders that we have installed, all give us confidence that we will reach our $500 million run rate on wavelength revenue by mid-year 2028, which is identical to what we laid out in our justification in September of '22 when we announced the potential transaction that ultimately closed in May of '23.

107. Defendant Schaeffer also reaffirmed that the Company would reach a $20 million quarterly run rate in wavelength sales in the fourth quarter of 2025 and denied that customers were delaying acceptance because they had over-purchased, stating:

> Yes, we still feel confident that we will hit that quarterly run rate in the fourth quarter. And I do want to go back to the over purchasing and delay comment. That is not what we've heard from customers. It's really, we're just surprised you did it when you said you would do it.

108. Also on August 7, 2025, the Company filed its quarterly report on Form 10-Q for the period ended June 30, 2025 with the SEC (the "2Q25 10-Q"), signed by Defendants Schaeffer and Weed and containing SOX certifications signed by them. The 2Q25 10-Q stated that the Company expected to require approximately $399 million to meet its expected dividend payments over the next two years, that it "currently plan[ned] to continue our current dividend policy," and repeated the same liquidity statement.

109. The statements referenced in ¶¶ 106-108 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading for the reasons set forth in ¶ 81.

110. Notwithstanding the deteriorating results, on August 6, 2025, the day before the 2Q25 results were released, the Board approved a fifty-second consecutive dividend increase, to $1.015 per share, and a $100.0 million increase to the Company's stock buyback program, to continue through December 31, 2026. The Company had previously repurchased 153,322 shares for approximately $8.0 million, at an average price of $51.97 per share, in June 2024. It repurchased an additional 229,507 shares for approximately $11.5 million, at an average price of $50.18 per share, in the second quarter of 2025, and 63,487 shares for approximately $3.1 million, at an average price of $48.13 per share, in July 2025.

111. On November 6, 2025, the Company issued a press release announcing its financial results for the third quarter of 2025, reporting only 281 net wavelength connections. The Company paused its stock buybacks and reduced its quarterly dividend from $1.015 per share to $0.02 per share, a reduction of approximately 98% and the first dividend reduction after fifty-two consecutive quarterly increases. On the associated earnings call (the "3Q25 Earnings Call"), Defendant Schaeffer stated that the Company "intend[s] to maintain our updated dividend policy until we reach a net leverage target of 4x EBITDA on an LTM basis," and conceded, with respect to the $20 million run rate, that "I am not today confident enough that the customers will accept them and we can start recognizing that revenue. . . ."

112. On this news, the price of Cogent stock declined $21.62 per share, or approximately 56%, from a closing price of $38.30 per share on November 5, 2025 to a closing price of $16.68 per share on November 13, 2025. The price of Cogent stock declined on each trading day during that period as the market digested the adverse revelations.

113. A Wells Fargo analyst noted that the dividend "will remain fixed until the company deleverages to 4.0x (from 7.4x in Q3)," cited "a notable competitive response from LUMN and T," and cut his wavelength estimates to "a modest ramp to nearly $200MM by 2028," and an RBC Capital Markets analyst concluded that "the demand for the wavelength business has not materialized to ramp to 500 monthly installs and eventually hit its $500M wavelength run-rate revenue target by mid-2028."

114. Even so, during the 3Q25 Earnings Call, Defendant Schaeffer stated: "We currently have a backlog and funnel of wave opportunities of 5,221 opportunities. We intend to continue to capture market share and believe our goal of 25% of the highly concentrated long-haul wavelength market in North America in three years is achievable."

115. The statements referenced in ¶ 114 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statements not misleading for the reasons set forth in ¶ 81.

116. On December 2, 2025, at the BofA Securities Leveraged Finance Conference, Defendant Schaeffer acknowledged that the Company's dividend had long exceeded its cash flow and that the capital demands of the Acquisition and the negative cash flow it brought had forced the dividend cut, stating:

> Let me just remind investors. We had a dividend policy for 15 years that dividended out more than 100% of cash flow. By growing EBITDA at about 18% a year, we were taking that growth in EBITDA and levering it and remaining levered between three and a half and four times EBITDA during that entire period. Because of the capital expenditures associated with the integration of the T-Mobile assets and the negative cash flow that we acquired, we have seen our leverage peak at 6.6 times net leverage. As a result of that, we made the decision to dramatically reduce our dividend from $1 a share a quarter to $0.02 a quarter.

117. On December 8, 2025, at a UBS investor conference, Defendant Schaeffer characterized the Company's post-Acquisition setback as "a one-time step back, which was not

unexpected," and revealed that the Company had paid out more than 100% of its cash flow by incurring additional leverage. Defendant Schaeffer stated, in pertinent part:

> We had 52 sequential quarters of growing our dividend and dividending it out more than 100% of cash flow by levering up incremental EBITDA. Cogent organically grew for 18 years as a public company with no M&A at 10.2%, with an average of 220 basis points a year of margin expansion. We took a one-time step back, which was not unexpected. . . .
>
> * * *
>
> I think there were two key drivers, Chris. One, prior to reporting Q3, it was clear that our dividend had become decoupled from our share price. Our dividend yield was nearly 11%, and therefore we felt that investors did not believe in the durability of the dividend. Two, our aggregate net leverage had increased to a peak of 6.6 times.
>
> We felt it was necessary to be able to demonstrate to debtholders that we were serious about returning to the net leverage that we had operated in for 13 years prior to Sprint. From 2010 through 2023, we were generally between 3.5 times and 4 times levered and growing our dividend. Now that our leverage is at 6.6, we need to demonstrate a commitment to delivering.

118. These admissions confirm that the Company's dividend had been paid in excess of its cash flow by "levering up," that the Company's net leverage, on an adjusted basis, had climbed to a peak of 6.6 times following the Acquisition, compared to between 3.5 and 4 times from 2010 through 2023, and that the Company's "step back" was "not unexpected." The Individual Defendants concealed these facts when they caused the Company to represent, in each periodic report through the 2Q25 10-Q, that it "currently plan[ned] to continue our current dividend policy" and that its cash would be adequate to meet its "dividend payments and other cash requirements."

119. On February 20, 2026, the Company issued a press release announcing its financial results for the fourth quarter and full year 2025, reporting 314 net wavelength connections. During the associated earnings call, and in a break from the Company's prior practice, the Individual Defendants refused to disclose the size of the backlog. When asked

about the Company's 10,000-order funnel target for year-end 2025, Defendant Schaeffer stated, in relevant part:

> While we were in the process of enabling the footprint, we felt it was critical to give funnel KPIs to show expressions of interest by customers. We have tried to be clear with investors that we do not give funnel data routinely for our other products, and we're treating wavelengths now as any other product. . . .
>
> Our funnel is continuing to grow, but we will not be reporting specific numbers.

120. Defendant Schaeffer thus conceded that the funnel figures the Individual Defendants had touted throughout the Relevant Period measured "expressions of interest by customers," not firm orders.

121. On this news, the price of Cogent stock declined $7.72 per share, or approximately 29%, from a closing price of $26.31 per share on February 19, 2026 to a closing price of $18.59 per share on February 20, 2026, and declined an additional $0.72 per share, or approximately 4%, to a closing price of $17.87 per share on February 23, 2026.

122. On March 3, 2026, at an investor conference, Defendant Schaeffer offered a further admission regarding the Company's disclosures concerning the wavelength business, stating: "We also probably made a mistake being too granular around both funnel size and exact progression in a specific product."

**The Truth Is Fully Revealed**

123. On May 4, 2026, the Company issued a press release announcing its financial results for the first quarter of 2026, reporting that wavelength customer connections increased by only 199, from 2,064 to 2,263. During the associated earnings call, Defendant Schaeffer finally admitted:

> On wavelength installs, we have seen a variety of customers pushing out their acceptance of wavelengths. We actually provisioned more wavelengths in the quarter than we did in the

> previous quarter, but the customers did not accept them. That decision to push out acceptance is being driven by constraints.

124. On this news, the price of Cogent stock declined $6.79 per share, or approximately 29%, from a closing price of $23.16 per share on May 1, 2026 to a closing price of $16.37 per share on May 4, 2026.

125. On May 26, 2026, a Morningstar analyst summarized market sentiment as follows:

> Accelerating growth in the wavelength business is most critical to meeting our growth expectations and moving the shares higher from here. Management has overpromised and underdelivered in this segment . . . .

## THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO ISSUE FALSE AND MISLEADING PROXY STATEMENTS

126. On March 25, 2024, the Company filed the 2024 Proxy with the SEC. The 2024 Proxy was drafted, approved, reviewed, and/or signed by the Individual Defendants and solicited shareholder votes to, *inter alia*: (i) reelect Defendants Schaeffer, Montagner, Bath, Brooks, de Sa, Ferguson, Howard, Howell, and Kennedy to the Board; (ii) ratify the Company's independent registered public accounting firm; and (iii) approve, on an advisory basis, executive compensation.

127. On March 26, 2025, the Company filed the 2025 Proxy with the SEC, which solicited shareholder votes to, *inter alia*: (i) reelect Defendants Schaeffer, Montagner, Brooks, de Sa, Ferguson, Howard, Howell, and Kennedy to the Board; (ii) approve an amendment to the Company's Bylaws setting the size of the Board at between six and eight directors; (iii) approve the Company's Second Amended and Restated 2017 Incentive Award Plan, which increased the number of shares available thereunder by 1.5 million; (iv) ratify the Company's auditor; and (v) approve, on an advisory basis, executive compensation.

128. On March 20, 2026, the Company filed its proxy statement on Schedule 14A with the SEC (the "2026 Proxy," and together with the 2024 Proxy and the 2025 Proxy, the

"Proxy Statements"), which solicited shareholder votes to, *inter alia*: (i) reelect Defendants Schaeffer, Montagner, Brooks, de Sa, Ferguson, Howard, Howell, and Kennedy to the Board; (ii) approve the Company's Third Amended and Restated 2017 Incentive Award Plan, which increased the number of shares available thereunder by 1.5 million; (iii) ratify the Company's auditor; and (iv) approve, on an advisory basis, executive compensation.

129. Each of the Proxy Statements assured shareholders that the Board was overseeing the risks facing the Company, stating, in relevant part:

> The Board's role in the Company is to provide general oversight of strategy and operations and to oversee the hiring, performance review, compensation review and termination, as applicable, of the executive officers of the Company. As part of its oversight of operations, it reviews the performance of the Company and the risks involved in the operations of the Company. The Board and the Audit Committee receive regular reports on the status of the Company's internal controls and each has reviewed key operational risks.

130. The 2024 Proxy and the 2025 Proxy further represented that the risks posed by Defendant Schaeffer's share pledges were being managed through the Audit Committee's quarterly review and the Board's pre-approval process, as described above.

131. The Proxy Statements were materially false and misleading because, inter alia: (i) the Board was not adequately exercising its risk-oversight functions, including with respect to the integration of the Sprint assets and the wavelength business that the 2024 Proxy and the 2025 Proxy represented were being closely monitored, as described above; (ii) the 2024 Proxy and the 2025 Proxy misleadingly assured shareholders that Defendant Schaeffer's pledging activities did not present a material risk of involuntary sales, notwithstanding the extent of his pledging and the Audit Committee's approval of exceptions to the Company's pledging-policy targets; (iii) the Individual Defendants were causing and/or permitting the Company to issue the materially false and misleading statements alleged herein; (iv) the Individual Defendants were violating the Code of Conduct; and (v) the Company failed to maintain adequate internal

controls. The forced sales in August 2025 demonstrated the consequences of the pledging risk described above. In addition, the 2025 Proxy and the 2026 Proxy misrepresented and/or failed to disclose the material facts concerning the Company's wavelength business and dividend sustainability identified in ¶ 81.

132. As a result of the Individual Defendants causing the Proxy Statements to be false and misleading, Company shareholders voted, *inter alia*, to reelect the Director Defendants (defined below) to the Board, allowing them to continue breaching their fiduciary duties to the Company, and to approve the Second and Third Amended and Restated 2017 Incentive Award Plans.

**INSIDER SALES**

133. While the price of Cogent stock was artificially inflated, and while in possession of material, nonpublic information, Defendants Schaeffer, Weed, Ferguson, Kennedy, Bath, and Howard (the "Insider Trading Defendants") sold their personally held Cogent stock as set forth below, as reported in their Statements of Changes in Beneficial Ownership on Form 4 filed with the SEC. None of the Form 4s reporting these sales indicated, by checking the box provided on the form for that purpose, that the transaction was made pursuant to a contract, instruction, or written plan intended to satisfy the affirmative defense conditions of Rule 10b5-1(c). By contrast, the Company's Chief Revenue Officer, James Bubeck, checked that box and disclosed that his sales were made pursuant to a Rule 10b5-1 plan adopted on December 9, 2022.

134. Defendant Schaeffer sold 1,624,000 shares of Cogent stock in voluntary sales between March 6, 2024 and June 16, 2025 for proceeds of approximately $89,127,689, as follows:

| Transaction Date | Shares Sold | Average Price Per Share | Proceeds (Rounded) |
|---|---|---|---|
| 3/6/2024 | 8,826 | $72.55 | $640,326 |
| 3/11/2024 | 35,000 | $67.93 | $2,377,550 |
| 3/12/2024 | 50,000 | $68.12 | $3,406,000 |
| 3/13/2024 | 30,000 | $67.52 | $2,025,600 |
| 3/15/2024 | 26,174 | $64.21 | $1,680,633 |
| 5/13/2024 | 50,000 | $59.44 | $2,972,000 |
| 6/12/2024 | 60,000 | $54.60 | $3,276,000 |
| 6/14/2024 | 60,000 | $51.78 | $3,106,800 |
| 8/27/2024 | 60,000 | $72.82 | $4,369,200 |
| 9/10/2024 | 65,000 | $71.75 | $4,663,750 |
| 11/25-26/2024 | 60,000 | $83.32 | $4,999,200 |
| 12/16/2024 | 20,000 | $75.88 | $1,517,600 |
| 3/4/2025 | 60,000 | $71.77 | $4,306,200 |
| 5/12-13/2025 | 54,000 | $50.37 | $2,719,980 |
| 5/14/2025 | 30,000 | $50.64 | $1,519,200 |
| 5/15/2025 | 40,000 | $50.38 | $2,015,200 |
| 5/16/2025 | 15,000 | $51.00 | $765,000 |
| 5/20/2025 | 15,000 | $49.96 | $749,400 |
| 5/21/2025 | 40,000 | $46.81 | $1,872,400 |
| 5/22/2025 | 25,000 | $46.27 | $1,156,750 |
| 5/23/2025 | 25,000 | $46.93 | $1,173,250 |
| 5/27/2025 | 20,000 | $48.67 | $973,400 |
| 5/28/2025 | 20,000 | $47.41 | $948,200 |
| 5/29/2025 | 25,000 | $46.90 | $1,172,500 |
| 5/30/2025 | 25,000 | $45.90 | $1,147,500 |
| 6/2/2025 | 65,000 | $46.33 | $3,011,450 |
| 6/3/2025 | 65,000 | $46.97 | $3,053,050 |
| 6/4/2025 | 75,000 | $47.76 | $3,582,000 |
| 6/5/2025 | 75,000 | $47.30 | $3,547,500 |
| 6/6/2025 | 80,000 | $47.78 | $3,822,400 |
| 6/9/2025 | 55,000 | $48.64 | $2,675,200 |

| Transaction Date | Shares Sold | Average Price Per Share | Proceeds (Rounded) |
|---|---|---|---|
| 6/10/2025 | 55,000 | $48.68 | $2,677,400 |
| 6/11/2025 | 55,000 | $48.51 | $2,668,050 |
| 6/12/2025 | 55,000 | $47.86 | $2,632,300 |
| 6/13/2025 | 55,000 | $47.40 | $2,607,000 |
| 6/16/2025 | 70,000 | $47.11 | $3,297,700 |
| **Total** | **1,624,000** | | **$89,127,689** |

135. In addition, on August 7 and 8, 2025, Defendant Schaeffer's lenders sold 2,659,578 of his pledged shares at average prices of $32.60 and $27.50 per share for proceeds of approximately $82,525,807, for a total of 4,283,578 shares and approximately $171.7 million in proceeds during the Relevant Period. Defendant Schaeffer's Forms 4 reporting these sales stated that each "represent[ed] a non-volitional transfer of Common Stock by the Reporting Person to one of the Reporting Person's lenders effectuated by the lender pursuant to the Reporting Person's margin loan facility." On August 7, 2025, the lender "sold the Common Stock to one of its affiliates at a 7% discount to the then market price," and on August 8, 2025, the lender "sold the Common Stock in a private block sale at an approximately 9% discount to the then market price." Following the forced sales, Defendant Schaeffer directly held only 697,143 shares of Cogent stock. These sales stand in stark contrast to Defendant Schaeffer's historical trading: in April 2021, the Board told stockholders that Defendant Schaeffer "has not sold a single share since 2006."

136. Defendant Weed sold 39,050 shares of Cogent stock for proceeds of approximately $1,913,046, as follows:

| Transaction Date | Shares Sold | Average Price Per Share | Proceeds (Rounded) |
|---|---|---|---|
| 3/12/2024 | 2,400 | $68.17 | $163,608 |
| 6/10/2024 | 2,400 | $52.60 | $126,240 |
| 9/3/2024 | 2,400 | $69.68 | $167,232 |

| Transaction Date | Shares Sold | Average Price Per Share | Proceeds (Rounded) |
|---|---|---|---|
| 12/2/2024 | 4,800 | $81.58 | $391,584 |
| 3/3/2025 | 4,900 | $72.06 | $353,094 |
| 5/16/2025 | 100 | $50.41 | $5,041 |
| 5/28/2025 | 100 | $47.66 | $4,766 |
| 6/9/2025 | 4,900 | $48.04 | $235,396 |
| 9/2/2025 | 4,900 | $36.98 | $181,202 |
| 12/11/2025 | 7,300 | $23.99 | $175,127 |
| 3/5/2026 | 4,850 | $22.63 | $109,756 |
| **Total** | **39,050** | | **$1,913,046** |

137. Defendant Ferguson sold 12,658 shares of Cogent stock for proceeds of approximately $550,329, as follows:

| Transaction Date | Shares Sold | Average Price Per Share | Proceeds (Rounded) |
|---|---|---|---|
| 5/21/2024 | 2,000 | $58.90 | $117,800 |
| 8/22/2024 | 1,550 | $72.62 | $112,561 |
| 11/18/2024 | 846 | $81.76 | $69,169 |
| 3/12/2025 | 956 | $69.36 | $66,308 |
| 5/28/2025 | 1,100 | $47.57 | $52,327 |
| 12/2/2025 | 4,000 | $20.34 | $81,360 |
| 3/5/2026 | 2,206 | $23.03 | $50,804 |
| **Total** | **12,658** | | **$550,329** |

138. Defendant Kennedy sold 15,115 shares of Cogent stock for proceeds of approximately $690,229, as follows:

| Transaction Date | Shares Sold | Average Price Per Share | Proceeds (Rounded) |
|---|---|---|---|
| 5/23/2024 | 1,640 | $57.79 | $94,776 |
| 9/10/2024 | 1,550 | $71.06 | $110,143 |
| 11/11/2024 | 1,350 | $80.58 | $108,783 |
| 3/3/2025 | 1,425 | $72.96 | $103,968 |

| Transaction Date | Shares Sold | Average Price Per Share | Proceeds (Rounded) |
|---|---|---|---|
| 5/13/2025 | 1,450 | $50.19 | $72,776 |
| 8/21/2025 | 2,000 | $36.35 | $72,700 |
| 11/11/2025 | 2,400 | $21.34 | $51,216 |
| 3/5/2026 | 3,300 | $22.99 | $75,867 |
| **Total** | **15,115** | | **$690,229** |

139. On November 21, 2024, Defendant Bath sold 6,220 shares of Cogent stock at $83.69 per share for proceeds of approximately $520,552.

140. On November 11, 2024, Defendant Howard sold 3,500 shares of Cogent stock at $82.02 per share for proceeds of approximately $287,070.

141. In total, the Insider Trading Defendants' voluntary sales generated proceeds of approximately $93.1 million, at prices ranging from $20.34 to $83.69 per share, far above the $16.37 per share at which Cogent stock closed on May 4, 2026. As a result of these sales, the Insider Trading Defendants were unjustly enriched.

## THE INDIVIDUAL DEFENDANTS CAUSED THE COMPANY TO REPURCHASE ITS OWN STOCK AT ARTIFICIALLY INFLATED PRICES

142. The Board authorized share repurchases while the Individual Defendants engaged in the misconduct alleged herein.

143. As a result, the Company purchased its own shares at prices inflated by the materially false and misleading statements alleged herein, causing it to pay more than it would have paid had the truth been disclosed.

144. During the Relevant Period, the Individual Defendants caused the Company to repurchase 495,140 shares of its common stock for approximately $24.7 million at prices artificially inflated by the false and misleading statements alleged herein. According to the Company's public filings, these purchases comprised the following:

| Period | Shares Repurchased | Average Price Per Share | Total Cost (Approx.) |
|---|---|---|---|
| June 2024 | 153,322 | $51.97 | $7,968,000 |
| April – September 2025 | 341,818 | $48.81 | $16,686,000 |
| **Total** | **495,140** | | **$24,654,000** |

145. Because the true value of Cogent stock was, at most, $16.37 per share, its closing price on May 4, 2026, the Company overpaid by approximately $16.5 million.

146. Notwithstanding these overpayments, on August 6, 2025, the day before the 2Q25 results were released, the Board approved a further $100 million increase to the Company's stock buyback program, to continue through December 31, 2026, which a J.P. Morgan analyst publicly questioned "given leverage . . . and liquidity concerns." The Company paused its repurchases on November 6, 2025, when it slashed its dividend, but on November 17, 2025, announced that it was authorized to resume repurchases under the program.

## DAMAGES TO THE COMPANY

147. As a direct and proximate result of the Individual Defendants' conduct, Cogent has lost and expended, and will continue to lose and expend, many millions of dollars.

148. Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company and Defendants Schaeffer and Weed, any internal investigation, and amounts paid to outside lawyers, accountants, and investigators in connection therewith, as well as any settlement or judgment in the Securities Class Action.

149. Such losses also include, but are not limited to, the costs of implementing remedial measures to address the Company's governance, disclosure, and internal-control deficiencies.

150. Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, the vast majority of which consisted of stock awards whose value was inflated by the false and

misleading statements alleged herein. Such compensation also included the 2024 cash incentive award of approximately $186,000 paid to Defendant Schaeffer that was linked to the very optical wavelength sales the Individual Defendants misrepresented. The Board has not clawed back any of this compensation.

151. Such losses further include the approximately $16.5 million that the Company overpaid to repurchase its own stock at artificially inflated prices.

152. As a direct and proximate result of the Individual Defendants' conduct, the Company's cost of capital has also increased. On August 14, 2025, S&P downgraded not only Cogent Communications Group LLC's issuer credit rating but also its issue-level ratings on the Company's senior secured notes, from BB to BB-, and on its senior unsecured notes, from B+ to B. On August 12, 2026, S&P downgraded Cogent Communications Group LLC again, to B-, citing the slower-than-expected expansion of the wavelength business.

153. As a direct and proximate result of the Individual Defendants' conduct, Cogent has also suffered and will continue to suffer a loss of reputation and goodwill, an increased cost of capital following S&P's negative outlook and downgrade, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

154. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered, and to be suffered, as a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, violations of federal law, unjust enrichment, waste of corporate assets, and other wrongful conduct as alleged herein.

155. Cogent is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

156. Plaintiff is a current shareholder of Cogent and has been a continuous shareholder of the Company at all relevant times. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

157. A pre-suit demand on the Board is futile and, therefore, excused. At the time this action was commenced, the Board consisted of eight directors: Defendants Schaeffer, Montagner, Brooks, de Sa, Ferguson, Howard, Howell, and Kennedy (the "Director Defendants"). Plaintiff is required to show that at least four of the Director Defendants cannot exercise independent and disinterested business judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Director Defendants are incapable of doing so.

158. Each of the Director Defendants faces a substantial likelihood of liability in this action because they caused and/or permitted the Company to make the false and misleading statements and omissions described herein. Because of their advisory, managerial, and directorial positions within the Company, the Director Defendants had knowledge of material, nonpublic information regarding the Company and were directly involved in its operations at the highest levels.

159. The Director Defendants either knew or should have known of the false and misleading statements and omissions that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that misconduct. Each of the Director Defendants signed the 2023 10-K and the 2024 10-K, which contained the false and misleading statements alleged herein, and solicited the false and misleading Proxy Statements, which led to their own reelection to the Board.

160. The Director Defendants also consciously disregarded a series of red flags. On February 27, 2025, the Company disclosed that it had removed 1,500 stale orders from the

wavelength funnel. On March 21, 2025, S&P revised its credit outlook to negative. On May 8, 2025, Defendant Schaeffer admitted that nearly 90% of the funnel that existed at the end of the third quarter of 2024 had fallen out, an outcome he characterized as "expected." Despite these red flags, and despite their own public undertakings to monitor the integration of the Sprint assets and the Company's liquidity, the Director Defendants permitted the Company to continue touting its wavelength backlog and $500 million target, to reaffirm its dividend policy in the 2Q25 10-Q, to raise the dividend yet again on August 6, 2025 while the Company's operating cash flow was negative, and to repurchase its own stock and authorize an additional $100.0 million in buybacks while its net leverage stood far above the 3.5x to 4x range in which the Company had historically operated. Thereafter, further red flags emerged. On August 7 and 8, 2025, lenders seized and sold 2,659,578 of Defendant Schaeffer's pledged shares, the very risk the Board had represented was not material. On August 14, 2025, S&P downgraded Cogent's credit ratings, and on August 15, 2025, the Company disclosed the abrupt retirement of its Chief Revenue Officer.

161. Demand is excused as to Defendant Schaeffer. Defendant Schaeffer is the Company's founder, CEO, President, and Chairman, and the Company concedes in the 2026 Proxy that he is not an independent director. Defendant Schaeffer derives his principal livelihood from the Company, having received total compensation of $12,680,860 in 2024 and $25,372,519 in 2025. Defendant Schaeffer personally made the false and misleading statements alleged herein on the Company's earnings calls, signed the 2023 10-K, the 2024 10-K, and each Form 10-Q referenced herein, and signed SOX certifications attesting to their accuracy. His personal finances, built on margin loans secured by his Cogent shares, gave him a powerful personal motive to maintain Cogent's stock price. He sold approximately $89.1 million of Cogent stock in voluntary sales while in possession of material, nonpublic information, and he is a named defendant in the Securities Class Action. Defendant Schaeffer therefore faces a

substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, therefore, excused.

162. Demand is excused as to Defendant Ferguson. Defendant Ferguson has served as a director since October 2018 and serves as Chair of the Audit Committee, which was charged with overseeing the integrity of the Company's financial reporting and with reviewing Defendant Schaeffer's pledges on a quarterly basis. Defendant Ferguson signed the 2023 10-K and the 2024 10-K, solicited the Proxy Statements, and permitted Defendant Schaeffer's pledging to exceed the limits of the Company's own policy. Defendant Ferguson also sold 12,658 shares of Cogent stock for proceeds of approximately $550,329 while in possession of material, nonpublic information. Defendant Ferguson therefore faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, therefore, excused.

163. Demand is excused as to Defendant Kennedy. Defendant Kennedy has served as a director since November 2019 and serves on the Audit Committee. Defendant Kennedy signed the 2023 10-K and the 2024 10-K, solicited the Proxy Statements, and failed to discharge her duties under the Audit Committee Charter. Defendant Kennedy also sold 15,115 shares of Cogent stock for proceeds of approximately $690,229 while in possession of material, nonpublic information. Defendant Kennedy therefore faces a substantial likelihood of liability, is not independent or disinterested, and demand upon her is futile and, therefore, excused.

164. Demand is excused as to Defendant Brooks. Defendant Brooks has served as a director since October 2003 and serves on the Audit Committee. Defendant Brooks signed the 2023 10-K and the 2024 10-K, solicited the Proxy Statements, and, as a member of the Audit Committee, failed to ensure the integrity of the Company's public disclosures and permitted Defendant Schaeffer's pledging to exceed the limits of the Company's own policy. Defendant

Brooks therefore faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, therefore, excused.

165. Demand is excused as to Defendant Montagner. Defendant Montagner has served as a director since April 2010, as Lead Independent Director since February 2020, and as Chair of the Compensation Committee, which approved the stock-based compensation of Defendants Schaeffer and Weed, including a cash incentive award to Defendant Schaeffer linked to wavelength sales. Defendant Montagner signed the 2023 10-K and the 2024 10-K and solicited the Proxy Statements. He also signed the letter to stockholders in the 2025 Proxy in which the Board represented that it "will continue to monitor the remaining integration efforts," and he chaired the Compensation Committee while the Board tied Defendant Schaeffer's cash compensation to wavelength sales. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls, and consciously disregarded his duties to protect corporate assets. Defendant Montagner therefore faces a substantial likelihood of liability, is not independent or disinterested, and demand upon him is futile and, therefore, excused.

166. Demand is excused as to Defendants de Sa, Howell, and Howard. Defendant de Sa has served as a director since December 2021, Defendant Howell since May 2022, and Defendant Howard since June 2022. Each signed the 2023 10-K and the 2024 10-K and solicited the Proxy Statements. In addition, on November 11, 2024, Defendant Howard sold 3,500 shares of Cogent stock for proceeds of approximately $287,070 while in possession of material, nonpublic information. Approximately 99.1% of each of their 2025 director compensation packages consisted of Cogent stock awards, aligning their personal interests with the inflated price of Cogent stock. As trusted Company directors, they conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements,

consciously disregarded their duties to monitor internal controls, and consciously disregarded their duties to protect corporate assets. Defendants de Sa, Howell, and Howard therefore face a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile and, therefore, excused.

167. In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the public, failed to comply with laws and regulations, and failed to maintain the accuracy of Company records, public reports, and communications. Thus, the Director Defendants face a substantial likelihood of liability, and demand is futile as to them.

168. Cogent has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not caused the Company to take action to recover the damages it has suffered and will continue to suffer.

169. The Director Defendants' conduct described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

170. The acts complained of herein constitute violations of fiduciary duties owed by Cogent's officers and directors, and these acts are incapable of ratification.

171. The Director Defendants may be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers'

liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the shareholders of Cogent. If there is a liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of Cogent, there would be no insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

172. If there is no liability insurance, then the Director Defendants will not cause Cogent to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

173. Accordingly, for all of the reasons set forth above, all of the Director Defendants, and at least a majority of them, cannot consider a demand with disinterestedness and independence. Consequently, a pre-suit demand on the Board is futile and excused.

## <u>COUNT ONE</u>

**Against the Individual Defendants for Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

174. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

175. The Individual Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

176. The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the materially false statements specified above, which they knew or

deliberately disregarded to be misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

177. The Individual Defendants employed devices, schemes, and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Cogent not misleading.

178. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Cogent. Defendants Schaeffer and Weed made the false and misleading statements on the Company's earnings calls and signed the Company's Forms 10-K and 10-Q and the SOX certifications alleged herein, and each of the other Individual Defendants signed the 2023 10-K and the 2024 10-K.

179. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and omissions disseminated to the public.

180. As a result of the foregoing, the market price of Cogent common stock was artificially inflated during the Relevant Period. The Company relied on the statements

described above and/or the integrity of the market price of Cogent common stock in repurchasing 495,140 shares of its own common stock for approximately $24.7 million at prices that were artificially inflated as a result of the false and misleading statements, and was damaged thereby, overpaying by approximately $16.5 million.

181. By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

182. Plaintiff brings this claim within two years of discovering the facts constituting the violation and within five years of the violation.

183. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

## COUNT TWO

### Against the Proxy Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9

184. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides:

> It shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

186. Rule 14a-9, promulgated pursuant to Section 14(a), provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

187. This Count is asserted against Defendants Schaeffer, Montagner, Bath, Brooks, de Sa, Ferguson, Howard, Howell, and Kennedy (the "Proxy Defendants"), each of whom, as a member of the Board, solicited and/or permitted the use of his or her name to solicit proxies through one or more of the Proxy Statements.

188. Under the direction and watch of the Proxy Defendants, the Proxy Statements failed to disclose the facts set forth in ¶ 131. The Proxy Defendants knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading.

189. The Section 14(a) claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Proxy Defendants and do not sound in fraud. Plaintiff specifically disclaims any allegation of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

190. The misrepresentations and omissions in the Proxy Statements were material to Company shareholders in voting on the Proxy Statements. The Proxy Statements were an essential link in the accomplishment of the Proxy Defendants' continued violations of their fiduciary duties, including the reelection of the Director Defendants to the Board and the approval of the Second and Third Amended and Restated 2017 Incentive Award Plans.

191. The Company was damaged as a result of the Proxy Defendants' material misrepresentations and omissions in the Proxy Statements.

192. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

## COUNT THREE

**Against Defendants Schaeffer and Weed for Contribution Under Sections 10(b) and 21D of the Exchange Act**

193. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

194. Cogent and Defendants Schaeffer and Weed are named as defendants in the Securities Class Action, which asserts claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Schaeffer's and Weed's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

195. Defendants Schaeffer and Weed, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

196. Accordingly, Defendants Schaeffer and Weed are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act. As such, Cogent is entitled to receive all appropriate contribution or indemnification from Defendants Schaeffer and Weed.

197. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

## COUNT FOUR

**Against the Individual Defendants for Breach of Fiduciary Duties**

198. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

199. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Cogent's business and affairs.

200. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

201. In breach of their fiduciary duties, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that misrepresented and/or failed to disclose, inter alia, that: (i) a substantial portion of the Company's reported optical wavelength "backlog" and "funnel" was unlikely to ever convert into paying customer revenue; (ii) the purported backlog and funnel consisted in large part of non-binding expressions of customer interest, from which Cogent released customers without obligation when it could not timely provision their orders; (iii) large numbers of customers in the purported backlog were unable or unwilling to accept delivery of wavelengths even when Cogent was in a position to provision them; (iv) as a result, customer demand for Cogent's optical wavelength services was materially weaker than represented; (v) the Company's wavelength business was not performing at the levels necessary to support Cogent's publicly stated revenue, margin, and $500 million wavelength run-rate targets, which lacked a reasonable basis; (vi) the Company's dividend payments exceeded its cash flow and depended on the Company incurring additional leverage, such that, as a result of the foregoing, the Company's long-standing dividend policy was unsustainable; (vii) Defendant Schaeffer's high-risk pledging activities exposed the Company to a material risk of forced sales that would further depress its stock price, contrary to the Audit Committee's assurance that such sales did not present a material risk; (viii) the Company failed to maintain adequate internal controls; and (ix) as a result of the foregoing, the Company's positive statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

202. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

203. In further breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls, consciously disregarded the red flags described above, permitted Defendant Schaeffer's share pledges to exceed the limits of the Company's own pledging policy, and caused the Company to repurchase its own stock at artificially inflated prices.

204. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

205. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Cogent has sustained and continues to sustain significant damages, including the costs of defending the Securities Class Action, exposure to potential class-wide damages, an increased cost of capital, and reputational harm. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

206. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

## COUNT FIVE

**Against the Insider Trading Defendants for Breach of Fiduciary Duties for Insider Trading**

207. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

208. By reason of their positions as officers and/or directors of the Company, the Insider Trading Defendants had access to material, nonpublic information concerning the Company's wavelength backlog, customer demand, financial condition, and dividend capacity.

209. At the time of their stock sales, the Insider Trading Defendants knew that information but sold Cogent stock on the basis of such information before it was disclosed to the market. This information was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated for their own benefit in breach of their fiduciary duty of loyalty.

210. Because the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Trading Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Trading Defendants obtained thereby.

211. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

## COUNT SIX

**Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duties**

212. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

213. By encouraging and accomplishing the illegal and improper conduct alleged herein and concealing it from the public, the Individual Defendants have each encouraged, facilitated, and advanced one another's breaches of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another

to breach their fiduciary duties, waste the Company's corporate assets, and engage in the illegal conduct complained of herein.

214. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

## COUNT SEVEN

### Against the Individual Defendants for Unjust Enrichment

215. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

216. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Cogent.

217. The Individual Defendants either benefitted financially from the improper conduct, including through the Insider Trading Defendants' stock sales, or received bonuses, stock awards, or similar compensation from Cogent that was tied to the performance or artificially inflated valuation of Cogent, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

218. Plaintiff, as a shareholder and a representative of Cogent, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

219. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

## COUNT EIGHT

### Against the Individual Defendants for Waste of Corporate Assets

220. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

221. The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and ongoing throughout the Relevant Period. It resulted in continuous, connected, and ongoing harm to the Company.

222. As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation to certain of the Company's executive officers and directors; (ii) awarding self-interested stock awards to certain officers and directors; (iii) causing the Company to repurchase its own stock at artificially inflated prices; and (iv) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions, including in the Securities Class Action.

223. As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

224. Plaintiff, on behalf of Cogent, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Cogent, and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Cogent;

C. Determining and awarding to Cogent the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

D. Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees, stock awards, options, and common stock sale proceeds, and imposing a constructive trust thereon;

E. Directing Cogent and the Individual Defendants to take all necessary actions to reform and improve Cogent's corporate governance and internal procedures to comply with applicable laws and to protect Cogent and its shareholders from a repeat of the damaging events described herein, including, but not limited to: (i) strengthening the Board's supervision of operations and disclosure of key performance indicators, including backlog and pipeline metrics; (ii) strengthening the Company's internal reporting and financial disclosure controls; (iii) strengthening and enforcing the Company's policies governing the pledging of Company stock by officers and directors; and (iv) developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board;

F. Awarding Cogent restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants, including the proceeds of the Insider Trading Defendants' stock sales;

G. Awarding punitive damages;

H. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

I. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 5, 2026

Respectfully submitted,

**STEVEN KRIEGER LAW, PLLC**

*/s/ Steven A. Krieger*
Steven A. Krieger (#1014093)
Katarina A. Nguyen (#219263)
2200 Wilson Boulevard, Suite 102
Arlington, VA 22201
Telephone: (703) 831-7707
Fax: (571) 512-5814
Email: steven@stevenkriegerlaw.com
Email: katarina@stevenkriegerlaw.com

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim (*pro hac vice* forthcoming)
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: philkim@rosenlegal.com

*Counsel for Plaintiff*